**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

RELO FRANCHISE SERVICES, INC.,                    Case No. 1:18-cv-578

            Plaintiff,                                        Dlott, J.
                                                             Bowman, M.J.
        v.

CONNOR GILMAN, et al.,

            Defendants.

**REPORT AND RECOMMENDATION**

**I.  Procedural Background**

Plaintiff Relo Franchise Services, Inc. ("RFS") initiated this lawsuit in state court on August 9, 2018, alleging in part that former franchisees, Connor Gilman, Charlene Gilman, and Incline Holdings, Inc., had breached their Franchise Agreement by abandoning their franchise and starting a competing business known as Pivotal Project Management, Inc. ("Pivotal").  Plaintiff's complaint includes additional claims for unfair competition, misappropriation of trade secrets, tortious interference with contract, prospective contract and business relations, and unjust enrichment.  (Doc. 6).

On August 14, 2018, Defendants Connor and Charlene Gilman, Incline Holdings, Inc. and Pivotal Project Management, Inc. removed the case to this federal Court on the

basis of diversity jurisdiction.[1]  The presiding district judge has referred this case to the undersigned magistrate judge.  (Doc. 5).

On August 15, Plaintiff's state court motion for a temporary restraining order ("TRO") was filed in this record. (Doc. 7).  The undersigned set the matter for a hearing on the TRO portion of the motion for August 16, 2018.  At a telephone conference prior to the hearing, counsel advised that the parties had come to an agreement in principle on the TRO and requested additional time in which to finalize that language.  (*See* 8/16/18 Minute Entry).  On August 17, 2018, the presiding district judge signed and docketed an Agreed Order of Injunction, in which Defendants agreed to be enjoined until further notice from certain activities, so long as the TRO was not considered to be a binding concession or admission by any party in future proceedings. (Doc. 11 at 2).  The TRO has remained in effect pending this R&R on the preliminary injunction.

After a period of expedited discovery, Defendants filed a response in opposition to the preliminary injunction on September 10, 2018.[2] (Doc. 21).  On September 12, 2018, Plaintiff filed its reply in support of its motion, and an evidentiary hearing was held on September 14 and 18, 2018. (Docs. 26, 29, 31).  Having reviewed the record presented, the undersigned now recommends that Plaintiff's motion for a preliminary injunction be GRANTED, subject to the appropriately narrow scope of the recommended injunction.

---

[1]There is no dispute that jurisdiction exists based upon the amount in controversy and the fact that Plaintiff resides in Ohio, while all Defendants reside in and/or are incorporated in Colorado.

[2]Pursuant to the Order of this Court, Defendants' response has been filed under seal, as have several depositions.  Plaintiff has moved to strike one of the exhibits attached to the response.  Plaintiff's motion has been granted by separate Order; therefore, Exhibit K to Defendants' response has not been considered in the context of this R&R.

## II. Findings of Fact

Tim Haines is the President of the Plaintiff Franchisor, a business that he describes as providing "commercial real estate project management services, including services helping large organizations facilitate office transitions from one location to another." (Doc. 7 at 20, testimony). The Franchise Agreement describes Plaintiff's business as a "commercial relocation consulting business." (Agreement, § 1.1). Plaintiff's slogan is "Changing the Way That Corporate America Moves," and Haines' business card identifies him as a "moveologist."

The Franchise Agreement states that it is between Plaintiff RFS as Franchisor, and three of the Defendants collectively identified as the Franchisee(s): Connor Gilman, Charlene Gilman, and Incline Holdings, Inc. ("Incline"). Connor Gilman testified that Incline was established for the purpose of purchasing the franchise.[3] In the Agreement, dated April 15, 2015, Connor Gilman, Charlene Gilman and Incline agreed to own and operate a Relocation Strategies, Inc. franchise in Denver, Colorado ("the Denver Franchise") for a period of 10 years commencing on April 27, 2015.

The Agreement requires each Franchise to pay bi-weekly royalty fees, which fees vary based upon four defined revenue streams.[4] (Agreement at §§ 5.1, 5.4). Relevant to the motion for a preliminary injunction, the Agreement contains non-compete and non-

---

[3]For the convenience of the Court, the witnesses who testified at the hearing are referred to by their surnames. Thus, Connor Gilman is frequently referred to as "Gilman." Charlene Gilman provided deposition testimony but did not testify at the hearing before the undersigned. To avoid confusion, she is referred to in this R&R either as "Mrs. Gilman" or "Charlene Gilman."

[4]Haines testified that Plaintiff has 19 franchises throughout the country, excluding the Denver Franchise.

solicitation agreements, as well as a non-disclosure agreement for confidential information.

Pursuant to Article 14 of the Agreement, the Gilmans and Incline agreed in part that after termination of the Agreement they would not "directly or indirectly, represent to the public or hold [themselves] out as a present or former franchisee."

Article 15 of the Agreement contains restrictive covenants applicable "During Term of Franchise Agreement," including but not limited to a non-solicitation covenant not to divert or attempt to divert any business or customer to any competitor, directly or indirectly. (*Id.* at § 15.2). Also in §15.2, the Gilmans and Incline agreed not to:

> (c)  Own, maintain, engage in, or have any interest in any business offering commercial relocation services or other services which are offered in the franchised business unless otherwise consented to in writing by the Franchisor; or
>
> (d)  Sell or perform for compensation any Permitted Products and Services, or otherwise operate the franchised business, within a franchise territory licensed to another franchisee…or otherwise infringe upon rights granted under franchise agreements with other franchisees….

(*Id.*)

Section 15.3 contains a non-compete agreement that on its face applies both during the 10-year term and for one year following the termination of the Agreement:

> Franchisee further covenants that, except as otherwise approved in writing by Franchisor, Franchisee will not, for a continuous and uninterrupted period commencing upon the expiration or termination of this Agreement (regardless of the cause for termination) and continuing for one (1) year thereafter, directly or indirectly, for itself or through, or on behalf of, or in conjunction with any person, persons, partnership, or corporation, own, maintain, operate, engage in, or have any interest in, any business offering commercial relocation services or other services which have been offered by the franchised business, which is or is intended to be located or which operates within the geographical boundary of Franchisee's Territory.

Franchisee and Franchisor agree that this covenant will survive the expiration, termination or cancellation of this Agreement.

(*Id.*) Defendants also agreed not to use "any confidential information, knowledge, or know-how" either "during the term of this Agreement or thereafter." (*Id.* at §§10.1, 10.2).

Article 15 specifies that any violation of its specified restrictive covenants "would result in irreparable injury …for which no adequate remedy at law may be available; and Franchisee accordingly consents to the issuance of and agrees to pay all court costs and reasonable attorneys' fees incurred by Franchisor in obtaining, an injunction prohibiting any conduct" in violation of the various covenants. (*Id.*, at § 15.8). Article 16 similarly states that Plaintiff will be entitled "without bond, to the entry of temporary and permanent injunctions and orders of specific performance enforcing the provisions of this Agreement" including but not limited to obligations under §§ 15.2 or 15.3. (*See id.*, §16.1).[5]

In addition to the covenants included in the Franchise Agreement, the Franchisee agreed to provide Plaintiff with executed "'Restrictive Covenant Agreements' similar in substance to those set forth in this Article 15" from the franchisee's officers, directors, owners, general partners, and any limited partners, as well as the officers, directors, and holders of any related entity, including from any person who might become associated with the Franchisee in the future. (*Id.*, at §15.9). The same provision required all covenants executed in any separate Restrictive Covenant Agreement to identify Plaintiff "as a third-party beneficiary of such covenants with the independent right to enforce them." (*Id.*) Consistent with this provision, Incline Holdings Inc. and Charlene Gilman

---

[5]Notably, §16.2 requires the parties to engage in mandatory arbitration "[e]xcept as provided in Section 16.1."

executed an additional Restrictive Covenant Agreement on April 15, 2015 that separately obligated Mrs. Gilman and Incline to restrictive covenants that mirrored the covenants in the Franchise Agreement, including the confidentiality, non-solicitation and non-compete agreements.  The separate Restrictive Covenant Agreement specifies that Plaintiff is a third-party beneficiary, and – like the Franchise Agreement – acknowledges irreparable injury for any breach that would entitle the Plaintiff to injunctive relief and attorney's fees.

Gilman testified that in 2015, he and his wife earned very little income from the new franchise and were disappointed in the training and level of support offered by Plaintiff from the outset of the relationship.  Despite that disappointing start, the Defendants continued to operate the franchise, and profits evidently grew.  As the Defendants' business increased, they hired additional employees.  In September or October 2016, Defendants hired their first Project Manager.  (Doc. 24, Charlene Gilman Depo. at 19-20).  In August 2017, Defendants hired a salesperson.  (*Id.* at 21).  In November 2017, Defendants hired another Project Manager.  (*Id.* at 22).  In April 2018, Defendants hired an Operations Manager.  (*Id.*)  By the end of 2017, the Denver franchise was the most profitable of all of Plaintiff's franchises, presumably resulting in a commensurate amount of royalties owed to Plaintiff.  Gilman testified that in 2017, the franchise earned approximately $400,000 in revenue.

By the end of April 2018, the Gilmans were talking about starting a new company. (Charlene Gilman Depo. at 33).  In May of 2018, Defendants filed formal articles of incorporation for their new company, Pivotal, allegedly in order to "break away from the franchisor" and offer "services that the franchisor did not support."  (*Id.* at 32).  At the hearing and in deposition testimony, the Gilmans testified that Pivotal was created to offer

6

services in owner's representation, construction project management and commercial project management.

On July 30, 2018, the Gilmans contacted Haines and Alex Taylor, Plaintiff's Director of Business Development, to advise them that they were terminating the operation of the franchise in order to work for Pivotal, their new commercial real estate project management company. Pivotal employs all of the former Denver Franchise employees, who hold the same titles at Pivotal that they previously held at the Denver Franchise. (Charlene Gilman Depo. at 20-22, 64; Connor Gilman Depo. at 53, testimony).

Defendants sent notice of their new business name to multiple industry contacts, characterizing the change as a "rebranding" of the prior Denver Franchise. Defendants admit that they, on behalf of Pivotal, have had or anticipate having contact with nine individuals or entities whom they previously met through their operation of the Denver Franchise. (Exh. 9 at Int. 8; Connor Gilman Depo. at 74-77, testimony). Pivotal has only three customers, all prior customers of their Denver Franchise: Trinity, Crystal Packaging, and Ethos Vet-Premier Vet Health. (Connor Gilman Depo. at 53, testimony).

Defendants began working with Trinity to complete a "new build" prior to the formation of Pivotal, while still employed with the Denver Franchise. (Charlene Gilman Depo. at 49-50; Gilman testimony). Although the proposal for the Trinity project had originated from the Denver Franchise, Defendants informed Trinity that they should start paying Pivotal because they had ended their franchise. (Connor Gilman Depo. at 53-54).

Likewise, Defendants began work with Crystal Packaging prior to the formation of Pivotal. (Charlene Gilman Depo. at 50-51; Connor Gilman Depo. at 77-78). As early as July 12, 2018, Connor Gilman had emailed Crystal Packaging to pitch services on behalf

7

of Pivotal that stated: "This proposal has been generated on behalf of Pivotal Project Management Incorporated, *formerly Relocation Strategies*. Please note you will still have the same great team attending to your project, and I will *still* be the point of service as a construction manager in this effort." (*Id.* at 81-82, Hearing Exh 4, emphasis added).

Ethos Vet is owned by the same person who owns Wheat Ridge Animal Hospital, another former Denver Franchise project.[6] The Denver Franchise began work with Ethos Vet around September or October 2017. Prior to the termination of the Denver Franchise, Connor Gilman was having weekly progress meeting conference calls for the Ethos Vet project on behalf of the Denver Franchise. (Connor Gilman Depo. at 80). After termination of the Denver Franchise, Gilman notified Ethos that calls would continue through Pivotal. Prior to Pivotal's association with Ethos Vet, the Denver Franchise paid royalties to Plaintiff for contract management services relating to work that included construction management, owner's rep work, and relocation management. (Connor Gilman Depo. at 36-37; Hearing Exh. 11, testimony).

Gilman conceded that Plaintiff "now" markets itself as doing owner's rep work but denied that Plaintiff did so when Defendants first purchased the Denver Franchise in April 2015. Nevertheless, Gilman admitted in deposition testimony that the Denver Franchise actually performed owner's rep work and construction management work during the more

---

[6]The Ethos Vet project is near Chicago, Illinois, not Denver, Colorado. However, Defendants' Agreement permits "Extra-Territorial Operation" when the Franchisee engages in a relocation project in which "the origination or terminus location…is located in" the territory of the Franchise, or the "employee with the primary decision-making authority for the client …is located within Franchisee's Territory" and the Franchise "was selected for the Project as the direct result of Franchisee's sales or marketing efforts." (Agreement, §1.3).

than three years that Defendants operated the Denver Franchise. (Connor Gilman Depo. at 39). For example, Gilman testified that Crystal Packaging, Ethos Vet, and Trinity were all prior "customers of [the Denver Franchise] in the area of *construction management.*" (*Id.* at 53, emphasis added).

Following the July 30 phone call, on August 2, 2018, Plaintiff notified the Defendants in writing of its position that they were in default and/or breach of the Franchise Agreement. The August letter articulated Plaintiff's position that the non-compete agreement "extends to relocation and any other services provided by the franchised business, which includes project management, construction management, contract management, owner's representation and similar services." (Doc. 7 at 71; Hearing Exh. 3).

Plaintiff now seeks a preliminary injunction: (1) to prevent Defendants from directing customers to stop contacting Plaintiff; (2) to stop Defendants from using or disclosing Plaintiff's trade secrets; (3) to stop Defendants from further breaching the non-compete and non-solicitation agreements; and (4) to prevent Defendants from otherwise wrongfully competing with Plaintiff. (Doc. 7 at 1).

### III.  Analysis

The purpose of a preliminary injunction is to maintain the relative positions of the parties until proceedings on the merits can be conducted. *University of Texas v. Camenisch,* 451 U.S. 390, 395 (1981); *see also Southern Milk Sales, Inc. v. Martin,* 924 F.2d 98, 102 (6th Cir. 1991). "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the

9

circumstances clearly demand it." *See Overstreet v. Lexington-Fayette Urban County Government,* 305 F.3d 566, 573 (6th Cir.2002).

In determining whether to issue a preliminary injunction, the Court balances the following factors:

1. Whether the party seeking the injunction has shown a substantial likelihood of success on the merits;

2. Whether the party seeking the injunction will suffer irreparable harm absent the injunction;

3. Whether an injunction will cause others to suffer substantial harm; and

4. Whether the public interest would be served by a preliminary injunction.

*See Procter & Gamble v. Bankers Trust Co.*, 78 F.3d 219, 226-227 (6th Cir. 1996); *Ne. Ohio Coal. For Homeless & Serv. Emp. Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1099 (6th Cir. 2006).  The party seeking the injunction must establish its case by clear and convincing evidence.  *See Garlock, Inc. v. United Seal, Inc.*, 404 F.2d 256, 257 (6th Cir. 1968); *Vanguard Transp., Sys., Inc. v. Edwards Transfer & Storage Co.*, 109 Ohio App.3d 786, 673 N.E.2d 182, 186 (Ohio Ct. App. 1996).  "Comprehensive findings on all four factors are unnecessary when fewer are dispositive of the issue."  *Avery Dennison Corp. v. Juhasz*, 924 F.Supp.2d 893, 899 (N.D.Ohio 2013) (internal quotation marks and additional citation omitted).

## A. Likelihood of Success on the Merits

Although no single factor is controlling, "a finding that there is simply no likelihood of success on the merits is usually fatal."  *Gonzoles v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).  I conclude based on the evidentiary record that this factor favors the Plaintiff. Prior to addressing the evidentiary record that supports that

10

conclusion, however, the undersigned briefly addresses several legal objections raised by Defendants to enforcement of the restrictive covenants.  Specifically, Defendants argue that: (1) not all of the Defendants signed the Franchise Agreement and Plaintiff was not a third-party beneficiary to the Restrictive Covenant Agreement; (2) Ohio's Business Opportunities Act and/or the doctrine of fraudulent inducement make the entire Franchise Agreement cancellable or void; (3) even if the Franchise Agreement is valid, the non-solicitation agreement in § 15.3 did not survive termination of the Agreement.

Additionally, Defendants argue that the non-compete agreement is overbroad. The latter argument will be addressed in discussion of the evidentiary record and in determining the appropriate scope of preliminary injunctive relief.

### 1. The Franchise Agreement and Restrictive Covenants Are Facially Valid

Defendants first argue that the Franchise Agreement should not be enforced because Plaintiff failed to produce an executed version.  However, an executed version was admitted into evidence at the hearing.  Contrary to Defendants' position, the undersigned finds the restrictive covenants contained in the Franchise Agreement to be fully enforceable against Charlene Gilman, Connor Gilman, and Incline, because all three are both separately and collectively identified as the "Franchisee" in the Agreement, which is signed by both Connor and Charlene individually and on behalf of Incline.  Based on the Gilmans' admitted relationship to the new company, the covenants are equally valid and enforceable against Defendant Pivotal.

Defendants next argue that the separate Restrictive Covenant Agreement is not enforceable by Plaintiff.  An express provision of the Restrictive Covenant Agreement

unambiguously states that Plaintiff is an intended third-party beneficiary.  However, Charlene Gilman and Incline reason that because Article 17 of the Franchise Agreement prohibits the "Franchisee" from entering into any agreement that would "benefit or obligate" the Franchisor, the ancillary Restrictive Covenant Agreement is void and unenforceable.  Alternatively, Defendants argue that the Restrictive Covenant Agreement is enforceable only against Incline, and not against Charlene Gilman and Connor Gilman.

The undersigned agrees with Plaintiff's characterization of this argument as "nonsensical."  The fact that Charlene Gilman and Incline alone executed the separate Restrictive Covenant Agreement is irrelevant, in part because that agreement is entirely duplicative of the restrictive covenants in the Franchise Agreement to which all parties are bound.  Additionally, Article 17 cannot be read in such a strained manner as to void the attached Restrictive Covenant Agreement, which was required by the Franchise Agreement.  Both by its terms and in context, Article 17 does not apply other than to "third parties" who are not party to the Franchise Agreement.

### 2. Neither Ohio's Business Opportunity Act Nor Fraudulent Inducement Void the Franchise Agreement

Defendants additionally posit that the Franchise Agreement is unenforceable because Plaintiff failed to provide a notice of Defendants' right to cancel the transaction five days after signature in April 2015.  *See* Ohio R.C. § 1334.06(A)(7), (B).  Defendants concede that many franchise transactions are exempt from the cancellation notice requirement so long as the franchisor "complies in all material respects" with the Federal Trade Commission disclosure requirements.  *See* R.C. § 1334.13(A).   However, Defendants reason that Plaintiff failed to fully comply with FTC disclosure requirements,

12

and therefore was not exempt from the cancellation notice requirement, because the Franchise Agreement did not disclose the true nature of the business. Defendants assert that the Agreement failed to explain that the franchised business included "front end commercial real estate project management services" rather than "solely commercial relocation related services." (Doc. 21 at 18, emphasis added). In a similar argument, Defendants contend that the Gilmans were fraudulently induced to execute the Franchise Agreement based upon a misleading sales presentation that described the Plaintiff's franchise as offering a "unique" and "niche" business.

The undersigned rejects Defendants' contention that the Franchise Agreement is unenforceable either under Ohio's Business Opportunity Act or because Defendants now claim that they were fraudulently induced to enter into the Agreement. The undersigned does not find the franchised business to have been as limited in scope as Defendants now assert. Further, the record does not support Defendants' recent contention that they were materially misled and fraudulently induced into entering the Franchise Agreement.

### 3. The Non-solicitation Covenant Remains Relevant

Defendants also assert that Plaintiff cannot demonstrate a likelihood of success relative to the non-solicitation clause contained in § 15.3, because by its express terms, that covenant restricted Defendants from soliciting the Denver Franchise customers only "during" the term of the Franchise Agreement. Defendants suggest that because the Agreement has terminated, the Plaintiff cannot show a likelihood that they will succeed in any claim relating to §15.3. Instead, Defendants argue that only the non-compete covenant is enforceable by this Court after termination of the Agreement.

13

However, the Agreement specifically states that temporary and permanent injunctions and orders of specific performance enforcing its provisions relating to both §15.2 and § 15.3 may be pursued in court. (Agreement, §16.1). The reasons for enforcement through preliminary injunctive relief in a case like this one is obvious; Plaintiff alleges continuing harm caused by the breach.

While Defendants are correct that the non-solicitation covenant could not be breached if their solicitation *first* occurred after the termination of the Agreement, Plaintiff presented indisputable evidence that Defendants did not wait until after they terminated the Denver Franchise to solicit the same customers previously served by the Denver Franchise. Rather, the evidence shows that Defendants actively planned to divert business and/or customers of the Franchise for the benefit of Pivotal *during* the operation of the Denver Franchise.

In addition, §15.2(b) expressly prohibited Defendants from "seek[ing] to employ any person who is at that time employed by …any franchisee…or otherwise directly or indirectly induc[ing] such person to leave his or her employment." Defendants admittedly employ all of the Denver Franchise's prior employees. Given the lack of any gap in time between the termination of the Denver Franchise and the operation of Pivotal, which was incorporated in May 2018 *during* the operation of the Denver Franchise, it is inconceivable that the Defendants did not "seek to employ the Denver Franchise's employees during their operation of the franchise.

### 4. The Evidentiary Record and Scope of the Restrictive Covenants

The undersigned turns next to Defendants' most vigorous argument – that the non-compete agreement and other covenants are unenforceable because they are overbroad.

14

"Ohio courts have long held that a preliminary injunction may be issued to enforce a covenant not-to-compete where the agreement to be enforced is valid, the agreement's restrictions are reasonable, and the party seeking the injunctive relief has demonstrated irreparable harm." *Prosonic Corp. v. Stafford*, 539 F. Supp.2d 999, 1002-03 (S.D. Ohio 2008). Frequently, the salient issues concerning the reasonableness of a non-compete agreement concern the length of the agreement and the geographic scope. However, neither of those issues is challenged by Defendants in this case. Instead, the Defendants challenge the specific scope of services included in the restrictive covenants.

In relevant part, the covenant not-to-compete to which the Defendants agreed in this case prohibits them from engaging or having any interest in "any business offering commercial relocation services *or other services which have been offered by the franchised business*…." (Agreement, § 15.3, emphasis added). Section 15.2(c) similarly prohibited Defendants during the tenure of the Agreement from having "any interest in any business offering commercial relocation services or other services which are offered in the franchised business."

At the evidentiary hearing, the primary issue addressed by the parties was the scope of services encompassed by the non-compete clause.[7] Ignoring the "other

---

[7]The Defendants also presented evidence that purported to show how little value the Defendants received at the outset of the Franchise Agreement in 2015 and continuing throughout the term of the Agreement despite their purchase price and payment of ongoing royalties. Except to the extent that it pertains to the issue of the scope of work performed by the franchised business, the undersigned does not find that evidence to be relevant to the motion for preliminary injunction. No counterclaims have been filed by Defendants, considering that they have yet to answer the complaint. However, § 15.7 of the Franchise Agreement states "that the existence of any claims [Defendants] may have against Franchisor, whether or not arising from this Agreement, will not constitute a defense to the enforcement by Franchisor of the covenants in this Article 15." *But see Economou v. Physicians Weight Loss Centers of America*, 756 F. Supp. 1024, 1034 (N.D.Ohio,1991) (holding that in case where franchisees asserted a breach of contract against Franchisor, a showing that defendants materially breached the franchise agreements would excuse

services…offered" language, Defendants first argue that they are not violating any restrictive covenants because Pivotal's business is not limited to "commercial relocation" and does not overlap in any way with the former business of the Denver Franchise. Alternatively, Defendants argue that the reference to "other services" in the restrictive covenants is so overbroad as to be unenforceable under Ohio law. Neither argument is convincing.

In contrast to the handful of fact-specific cases cited by Defendants involving overly broad non-compete language that an employer sought to enforce in order to preclude a specific employee from engaging in any "similar" business, courts have repeatedly upheld as "reasonable," under Ohio law, restrictive covenants similar to those presented here, to which a former franchisee has agreed. *See, e.g., Economou v. Physicians Weight Loss Centers of America*, 756 F. Supp. 1024 (6th Cir. 1991); *Dealer Specialties, Inc. v. Car Data 24/7, Inc.*, Case No. 1:15-cv-170, 2016 WL 5341797 at*6 (S.D. Ohio Sept. 23, 2016) (noting that the franchise agreement made clear that the covenant not to compete was an integral aspect of the franchise, which "further supports the reasonableness of the restrictive covenants and their enforcement"); *H.H. Franchising Syst., Inc. v. Aronson*, Case No. 1:12-cv-708, 2015 WL 401343 (S.D. Ohio Jan. 28, 2015).

Plaintiff presents clear and convincing evidence that Defendants, through Pivotal, offer services that overlap with and directly compete with services actually offered by the Denver Franchise. It is true that at the time that Defendants purchased the franchise in 2015, the primary purpose of a franchise was to engage in "commercial relocation

---

the franchisees from further performance, including from their obligation to honor their noncompete agreements).

consulting." (Agreement, Article 1.1).   However, the Franchise Agreement's repeated reference to "other services…offered by the franchised business," references in the Operations Manual and training materials, case studies, and marketing materials, made abundantly clear that Plaintiff's franchised business was never *exclusively* limited to managing a move from location A to location B, but included renovating existing space and significant services in the areas of "project management," "construction management" and "owner's representation" associated with both moves to new commercial space and remodels of exhibiting space.  (*See, e.g.*, Plaintiff's Exhs. 12-22; *see also* Defendants Exh. L at page 1, stating franchised business will "offer strategic move planning, consulting, project management and general contracting services to assist …with the planning, management and execution of business relocation and renovation projects").   From the outset of their training in Cincinnati, the Gilmans were made aware of "other services" through their tour of the Clarke facility,[8] which included office re-configuration and space design and a significant amount of project management in the course of substantial renovation of new warehouse space. (*See, e.g.*, Hearing Exh. 5, flow chart reflecting project management and construction process for Clarke facility, Hearing Exh. 7, testimony).

The Franchise Agreement based the amount of royalties owed by franchisees on the category of revenue stream from which the revenue was generated, including general

---

[8]Gilman testified that the Cincinnati training was cut short from 5 days to 3 and a half, and that no makeup training was ever scheduled.  He additionally testified that there was little to no real "training" offered on any construction management services associated with the Clarke facility.  Nevertheless, when viewed in the context of the record as a whole, the Clarke example adds to the weight of clear and convincing evidence that the franchised business included some aspect of construction and contract management services at the time the franchise was purchased.

contracting revenues, consulting revenues, "cost-plus" revenues, plus "contract management" revenues. (Agreement, § 5.1). Taylor testified that in 2017, contract management (for which a half percent royalty was owed) amounted to 6% of franchisee revenue as a *weighted* average. (Hearing Exh. E). By contrast, Haines testified that in 2017, 12-15% of the revenue from franchised business was reported as "contract management" and/or "construction management," an increase over the 8-10% reported five years earlier.[9] Haines defined the term "construction management" as including services that were not equivalent to that of a general contractor, but instead a third party "owner's rep" who would select venders and oversee the entire construction project to completion. The breakdown between consulting revenues and contract or construction management revenue was not always clearly defined. (Taylor testimony). Thus, the revenue categories did not correspond precisely with the "Suite of Services" listed by franchised businesses.

Over time, Plaintiff grew the portion of its business involving construction management/commercial project management and/or contract management services, along with owner's rep work, despite its continued focus on "relocation" (broadly defined to include renovation) through July 30, 2018. The Denver Franchise in particular continued to expand its owner's rep and project management work during the entire three-year three-month tenure of the franchise, including its construction management services.

At the hearing and in testimony, Defendants struggled to paint Pivotal as offering

---

[9]Haines testified that his forecasting models projected that, in five years, project management would comprise of approximately 35-40% of Plaintiff's business. The undersigned finds this particular testimony to be both speculative and irrelevant to the issuance of the preliminary injunction.

much broader categories of services, while simultaneously trying to paint the Denver Franchise as offering an extremely narrow and limited scope of services that otherwise would appear to fall within the same categories. At one point, Gilman testified that the only work that the Denver Franchise had previously performed for Crystal Packaging was "relocation management," which he attempted to distinguish from the broader "construction management" services in which Pivotal is engaged. (Connor Gilman Depo. at 84-85, testimony). However, inconsistencies in Gilman's testimony strained credulity, since he conceded that the Denver Franchise in fact had performed "construction management" services for all three of its former clients. (Connor Gilman Depo. at 53; hearing testimony). Gilman variously testified that to the extent that the Denver Franchise had in fact engaged in owner's rep or construction management, Defendants were not given adequate "support" from Plaintiff for that aspect of their business. But complaints about Plaintiff's level of support necessarily acknowledge that the Denver Franchise was engaged in the referenced services.

Gilman maintained that Plaintiff offered only "light" [a/k/a "lite"] construction management, defined primarily by distinguishing it from "heavy" construction management. However, the record illuminated no clear-cut distinctions. Taylor testified that remodels could involve significant construction. Thus, both the Denver Franchise and Pivotal might engage in paint and carpet installations.[10] In a further attempt to differentiate, Gilman testified that a Pivotal bid for additional work for a former customer

---

[10]Gilman emphasized that Plaintiff's sales materials reference "non-permitable" work, stressing that Pivotal's work includes the permitting process. However, the fact that Pivotal is willing to perform some work in which the Denver Franchise would not typically engage does not mean that Pivotal does not compete in substantial ways with the Plaintiff's franchised business.

was for a "new build," whereas in *most* work previously completed by the franchise, the Denver Franchise's paint and carpet installations occurred in existing (renovated) structures rather than in a structural addition.  Yet, in contrast to Gilman's testimony, the Denver Franchise had previously engaged in the same scope of work.  (*See* Hearing Exh. 11).  And even Gilman admitted that there is no "black and white" line between the services offered by the Denver Franchise and the services offered by Pivotal.  (Connor Gilman Depo. at 127).  In fact, the evidence reflects that the "new build" was merely an addition to an existing structure on the same property, which addition shares a wall with existing space.

In January and February 2016, Gilman sought Plaintiff's approval for the Denver Franchise to engage in work with Wheat Ridge Vet Hospital on their move to a yet-to-be-built veterinary hospital.  With respect to the proposed scope of the project, Haines advised Gilman that he did not support the Denver Franchise taking on the entire "design build" because it included a 9.1 million dollar cap on costs and building a new hospital on a "blank field of dirt."  An email states "a 'Design-Build with option for a Guaranteed Max Price'…is a General Construction Contractor bid package." (Exh. 10).  Haines states:  "I just don't think that is us."  Haines testified that he did not approve the 9.1 million dollar proposal because he believed that the financial risk to the Denver Franchise was too great and that Gilman did not have the requisite expertise.  Haines proposed instead that the Defendants bid out the project as a "flat fee" by limiting the scope of work to project management.  Defendants did so and were awarded approximately $100,000 worth of project management work.  (Testimony, Hearing Exh. 11).

Defendants started Pivotal two and a half years later in order to free themselves from Plaintiff's control and to avoid paying future royalties on ongoing and future work for which they believed they were receiving little "value" or benefit from Plaintiff, defined by Defendants as training and support. Connor Gilman's deposition testimony was particularly telling:

> We felt the services that we were providing [through the Denver Franchise] on the roles of owner's rep and construction management were not being supported, advised upon, instruction given or any value of the sort on behalf of Relocation Strategies, and, as such, we did not see that there was a reason to continue forward under a franchise relationship with royalties.

(*Id.* at 41).

A review of the Denver Franchise's February 2016 proposal confirms that the Denver Franchise represented Wheat Ridge "as the Owner party and [to] oversee…the entire scope of the design-build construction and relocation project." (Exh. 11). The proposal clearly includes services that fall within both parties' descriptions of project management, owner's rep and construction management or contract management. In short, the undersigned finds that Plaintiff has demonstrated a substantial likelihood of success that Defendants are violating the non-compete covenant through their new company, Pivotal. The undersigned further finds that Plaintiff has demonstrated a likelihood of success that the Defendants are engaged in using confidential and proprietary information, including trade secrets, and that they violated the non-solicitation agreement.

Defendants argue that the Plaintiff's attempt to restrict Defendants from using pricing formulas, marketing methodologies and client lists do not sufficiently define those categories of information or how they are trade secrets. Defendants complain that the

alleged "trade secrets" are of little to no real value, but notably rely on a distinguishable case involving a "born salesman" rather than a franchise case. *See Patio Enclosures, Inc. v. Herbst*, 39 Fed. Appx. 964 (6th Cir. 2002). Defendants further argue that they have returned anything of value to the Plaintiff by returning the Operations Manual and other materials, so that they no longer possess anything worth enjoining.

However, a comparison of a contract proposal offered by Pivotal to prior contract proposals offered by the Denver Franchise undermines Defendants' arguments and reveals striking and disturbing similarities in formatting and language. (*Compare* Hearing Exh. 4 and 24). Gilman's explanation that such cover letters and proposals are generic and non-confidential or proprietary is not credible. The Pivotal proposal contains virtually identical language to franchise proposals and states: "This document, its samples, and pricing were provided to assist your organizations with making a safe and sound decision for move and project management services. [Pivotal] considers this document, its formatting, our pricing, and our proposed methods to be unique and confidential." (Exh. at 2). Similar information is frequently considered to be proprietary. *See Polymet Corp. v. Newman*, Case No. 1:16-cv-734, 2016 WL 4449641 (S.D. Ohio Aug. 24, 2016). Last but not least, Privotal's proposal inexplicably includes a reference to "RSI" (the acronym used by the Denver Franchise) in a pricing section, which Gilman unconvincingly ascribed to a "drafting error," insisting he had not copied and pasted any of Plaintiff's proprietary documents. (*See* Hearing Exh. 24 at 7).

### B. Plaintiff's Showing of Irreparable Harm

The second factor required to show entitlement to preliminary injunctive relief - irreparable harm - also favors Plaintiff.

The undersigned rejects Defendants' position that Plaintiff cannot show irreparable harm because there is no overlap between the services offered by Pivotal and those offered by the terminated Denver Franchise. As explained above, the evidence is to the contrary. The non-compete clause contained in § 15.3 prohibits Defendants from "directly or indirectly" engaging in "any business offering commercial relocation services or other services which have been offered by the franchised business…." Thus, the Defendants may not offer services to *anyone*, including Plaintiff's prior customers, that were previously offered by the franchised business.

The undersigned further rejects Defendants' position that no irreparable harm can stem from any violation of the non-solicitation agreement. In contrast to Defendants' position that any breach of that covenant ended with the termination of the Agreement, Plaintiff has demonstrated continuing harm from the breach that began when the Agreement was still in force. Moreover, Defendants' continued misappropriation of Plaintiff's confidential formatting and language used by the franchised business through bid proposals forwarded to the Denver Franchise's prior customers poses a genuine threat of irrevocable harm. *Accord Economou*, 756 F. Supp. at 1039 (franchisor had demonstrated irreparable harm due to potential loss of the control of reputation, loss of good will, and consumer confusion, supporting imposition of preliminary injunction against former franchisees who opened new competing business). The Agreement itself clearly anticipated injunctive relief for breaches of the referenced restrictive covenants. (Agreement, §§10.2, 15.8, 16.1). *Accord H.H. Franchising Sys., Inc. v. Aronson*, 2015 WL 401343 at *9 (holding that evidence that Defendants signed franchise agreement that a violation of the post-termination non-compete covenant would cause "irreparable

23

injury…for which no adequate remedy at law would be available" was "sufficient," in combination with evidence of breach, to prove irreparable injury).

Moreover, evidence was presented that some individuals and entities were recently confused by the Defendants' communications characterizing Pivotal as a "rebranded" version of the Denver Franchise, and inquired whether Plaintiff had changed its name. Haines also testified that it is impossible to market the Denver Franchise as a viable business given the direct ongoing competition posed by Pivotal occupying the same area and marketing many of the same services. "[C]ustomer confusion is always a danger in this situation, especially where the former franchisee is operating his new business out of a center previously used to serve another principal. Such confusion has the potential of leading to damage to the franchisor's tradename and reputation." *Economou*, 756 F. Supp. at 1032.

### C. Substantial Harm to Others

Pivotal protests that it will be substantially harmed if broad injunctive relief is granted, and that the "benefit to [Plaintiff]…is significantly outweighed by the detriment to Pivotal." (Doc. 21 at 15). However, "[w]hile Defendants may argue that granting this relief would harm their business, Defendants may not benefit from their breach of contract." *Dealer Specialties*, 2016 WL 5341797 at *8.

Still, the Gilmans argue that the breadth of the requested injunction would preclude them from working anywhere in the commercial real estate project management industry despite their independent development of skills unrelated to their ownership of the franchised business. Under Ohio law, a non-compete agreement that is so broad in scope as to prevent the former employee from earning a living, or that prevents an employee

from using skills that he or she possessed prior to signing the non-compete agreement, will not be enforced. *See generally, Patio Enclosures, Inc. v. Herbst*, *supra*. Defendants generally maintain that they had acquired project management experience prior to the acquisition of the Denver Franchise, and sought out additional training and advice independent from their operation of the franchise. For instance, Gilman testified that he possessed an MBA and "significant" construction project management experience.

The record does not support Defendants' assertions about their level of training and experience prior to the operation of the Denver Franchise. There is some irony in Gilman's overbroad characterization of that prior experience, particularly when contrasted with his extremely narrow view of the "project management" experience gained through the Denver Franchise. On cross-examination, Gilman admitted that his prior education and experience arose from a sports management degree, work on a highway and cemetery, work performed doing environmental safety and compliance, and selling dental equipment. With the possible exception of the permitting process and new construction that is being erected on <u>entirely</u> vacant, undeveloped land, the undersigned views little of Gilman's pre-franchise education, training and experience to be closely aligned with the work of Pivotal, particularly as contrasted with the highly relevant training and experience gained through his operation of the Denver Franchise. The undersigned also was not persuaded by Gilman's testimony that he sought additional training and mentoring from Phillip Infelise and NAIOP, a commercial real estate development association. All of that informal training and mentoring was gained through the Denver Franchise.[11]  *Accord,*

---

[11]Gilman testified that he was generally "familiar" with the NAIOP organization prior to purchasing the franchise and paid for his own NAIOP dues. However, he conceded that Plaintiff recommended that he

*Economou*, 756 F. Supp. at 1032 ("[T]he franchisee has gained knowledge and experience from the franchisor, and to allow the franchisee to use this knowledge and experience to serve former or potential customers of the franchisor would work a hardship and prejudice to the latter"); *see also generally UZ Engineered Prods. Co. v. Midwest Motor Supply Co., Inc.*, 147 Ohio App.3d 382, 770 N.E.2d 1068 (Ohio Ct. App. 2001). Likewise, the undersigned finds that Charlene Gilman's prior education and experience was limited to the financial sector, and primarily derived from her prior employment with a hedge fund.

Defendants further argue that the three customers of Pivotal would suffer if Pivotal were required to stop work on ongoing projects. While this argument is somewhat more persuasive, it does not preclude enforcement of an otherwise valid restrictive covenant. Assuming that the former Denver Franchise customers were completely unaware of the Defendants' breach of their Franchise Agreement, this factor only marginally favors the Defendants, and can be addressed through appropriate limitation in the scope of the preliminary injunction.

### D. Whether the public interest would be served by a preliminary injunction

The public interest factor does not weigh heavily in this case. As another court put it, "if the public has an interest in these issues at all, it is in seeing that reasonable non-compete covenants are preserved." *Economou*, 756 F. Supp. at 1039; *see also Dealer Specialties*, 2016 WL 5341797 at *8.

---

join NAIOP in order to assist in the growth of the franchise.

### IV.  Scope of Preliminary Injunction

Under Ohio law, a court may modify an overly broad restrictive covenant in order to narrow its scope to that which is no more than necessary to protect the employer's legitimate business interests.  *See generally, Economou*, 756 F. Supp. at 1031 (citing *Raimonde v. Van Vierah*, 42 Ohio St. 2d 21, 26, 325 N.E.2d 544 (1975) (additional citations omitted).   Typically, a non-compete agreement will be modified by a court if it does not contain limitations as to time and space, but other limitations also may be imposed.  *See id.* at 1031-1032.

A portion of Defendants' argument on the alleged overbreadth of the restrictive covenants at issue boils down to whether the enforcement of the covenants would preclude Defendants from engaging in any legitimate (non-competing) business.   Even if Pivotal's business is competing, Defendants' arguments seem to suggest that the benefit to Plaintiff is so disproportional to the detrimental impact on the Defendants that this Court should not enforce the non-compete or other covenants as written.

The undersigned only partially agrees.   The temporal and geographic scope of the requested preliminary injunction is reasonable, insofar as Defendants should be prohibited from engaging in business that violates their non-compete covenant within the geographic scope of the counties defined in the Franchise Agreement, for a period of one year from the termination of that Agreement.   Defendants' efforts to portray the services offered by Pivotal as "broader" than the scope of their former Denver Franchise remain unconvincing, as the record reflects that to date, Pivotal's services substantially overlap with services that "had been offered" by the Denver Franchise.  Although the Ethos Vet

27

project is not in the Denver area, that work appears to have been originally obtained and approved through the Denver Franchise under §1.3 of the Agreement.  In addition, to date, Defendants appear to have misappropriated confidential information in soliciting work, and further appear to have violated the non-solicitation covenant in converting three former Denver Franchise customers to customers of their new company prior to the termination of the Agreement.

Still, Defendants put on evidence that their future intention is to expand the services of Pivotal well beyond the focus of the Denver Franchise, and to offer "non-competing" services to the extent that the Denver Franchise did not previously offer "comprehensive" construction and/or contract management of brand "new construction," defined as the construction of a new building or buildings from the ground up on vacant or otherwise undeveloped land, distinct from the renovation or rehabilitation of, or addition to, any existing structures.   Plaintiff did not offer any evidence that - despite the growth of franchise services including in the area of construction management - the franchised business intends to expand into brand new construction that does not involve relocation. Even within the territory of the Denver Franchise, then, such future "new construction" would be non-competing work and would not appear to violate any restrictive covenant, so long as the work was not solicited from a prior customer of the Denver Franchise until after July 30, 2018 and Defendants did not use confidential information in the course of soliciting the new work.

Considering the "harm to others" factor and the record as a whole, the undersigned declines to recommend preliminary injunctive relief that would prevent Defendants from continuing ongoing or planned services for Trinity, Crystal Packaging, and Ethos Vet-

Premier Vet Health.  As noted, only two of the three referenced projects fall within the territorial boundaries of the Denver Franchise.[12]  Despite the clear and convincing evidence of Defendants' breach, granting preliminary injunctive relief would result in harm to those third parties, and likely would spawn satellite litigation.  In addition, monetary damages appear to be capable of providing an adequate remedy to Plaintiff for the ongoing work for the referenced three projects.   On the other hand, Defendants should be precluded from entering into any new work for these three prior Denver Franchise customers, including "new construction" that has not previously been negotiated.  Defendants also should be enjoined from further violating their non-compete agreement within the defined territory of the Denver Franchise Agreement.

### V.  Conclusion and Recommendation

For the reasons stated, **IT IS RECOMMENDED THAT** Plaintiff's motion for a preliminary injunction should be **GRANTED** by this Court, with the adoption of an Order the enjoins all Defendants as follows:

1. Defendants are enjoined from directing former customers to stop contacting Plaintiff;

2. Defendants are enjoined from accessing, using, disseminating or disclosing Plaintiff's confidential materials and trade secrets;

3. Defendants are enjoined from further breaching the non-compete agreement in the territory defined by the Franchise Agreement as follows:

---

[12]Apart from Defendants' work for former customer Ethos Vet, Defendants' solicitation of new business in Illinois or anywhere else outside of the defined territorial boundaries presumptively would not violate the non-compete agreement.  Haines testified that Plaintiff does not presently have a franchise in the Chicago, Illinois area.  Plaintiff's future intentions to open such a franchise do not preclude the Defendants from legitimate competition.

29

a. Within the referenced territory, Defendants may continue to offer construction or contract management services, defined as "comprehensive advice, counsel, oversight, and management of various construction, engineering, architectural, design, mechanical, technological, civil, and structural projects" for New Construction projects only. "New Construction" is limited to new buildings to be built from the ground up on vacant or otherwise undeveloped land, but excludes renovations, rehabilitations, additions to, or rebuilds of existing buildings or structures.

b. Notwithstanding the above paragraph and definition of "New Construction," Defendants may not offer additional construction or contract management services to Trinity, Crystal Packaging, or Ethos Vet-Premier Vet Health beyond the scope of projects in which they are presently engaged;

4.  Outside of the geographic territorial scope of the noncompete agreement and in areas where Plaintiff had no presence as of July 30, 2018, Defendants may offer any construction or contract management services, including relocation-related services.  However, no offer of competing or other additional services outside of the restricted territory may be conveyed to Trinity, Crystal Packaging, or Ethos Vet-Premier Vet Health at this time;

5. This preliminary injunction shall continue until July 30, 2019, unless earlier terminated by this Court.

>  */s Stephanie K. Bowman*
>  Stephanie K. Bowman
>  United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

RELO FRANCHISE SERVICES, INC.,                    Case No. 1:18-cv-578

        Plaintiff,                                  Dlott, J.
                                                                 Bowman, M.J.

   v.

CONNOR GILMAN, et al.,

        Defendants.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN  (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).